(No. 1944— ■)

JEAN A. MACK, ADMINISTRATRIX OF THE ETATE OF ROLAND E. MACK, ALSO KNOWN AS RAYMOND E. MACK, DECEASED, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed February 12, 1935.*
*Rehearing denied October 17, 1935.*

RALPH L. NETTLAND and HOWARD S. NETTLAND, for claimant.

OTTO KERNER, Attorney General, and JOHN KASSERMAN, Assistant Attorney General, for respondent.

MR. CHIEF JUSTICE HOLLERICH delivered the opinion of the court:

On or about the 15th day of July, 1931 plaintiff's intestate, Roland E. Mack, enlisted as a private in the 202nd Coast Artillery, AA, National Guard, which was to go into camp at Camp Grant, Illinois on or about August 1st, 1931. He was a member of the advance detail which was sent to Camp Grant on July 28th, 1931, to wit, three days before the arrival of the regiment, and was assigned to Battery H. The regiment had arrived at Coon Creek on August 1st, had pitched a bivouac for the night, and intended to break camp early in the morning and proceed to Camp Grant. It was necessary that additional provisions be drawn to the location from Camp Grant for the morning breakfast, and on August 1st, Captain Walter Reichardt ordered a truck to load provisions at Camp Grant, and proceed to Coon Creek in the evening.

Several members of the advance detail stated to Captain Reichardt and Captain Leonard McPhail that they desired to attend a dance at Coon Creek that evening and asked for some means of transportation to make this possible. Captain McPhail told the men that the provision truck would be loaded and sent to Coon Creek about six o'clock P. M. and that if there was room for them to get aboard and ride, it would be satisfactory to him, provided they were in uniform. Claimant's intestate, however, was not one of the men who asked Captain McPhail for transportation to Coon Creek as aforesaid.

Plaintiff's intestate and about ten others of the advance detail helped load the truck at the regimental supply house, with the expectation of obtaining a ride. When the truck left Camp Grant, there were thirteen (13) men on it, in addition to the load of provisions. There was not room for all of the men in the truck, so several of them rode on the fenders and running boards. Plaintiff's intestate was seated on the left front fender of the truck, facing the rear of the truck, with his back to Private Walter S. Heller who was also seated on the left front fender, but was facing the front of the truck, with his feet on the bumper. The truck left Camp Grant about seven o'clock P. M. and proceeded on S. B. I. Route 25. It was without lights, but Sergeant Stone, who was seated at the right of the driver, was holding a large-battery flash light type lamp to be used for lighting purposes when that became necessary. The official weather reports show that the

sun set at 7:05 P. M. that day. After leaving Cherry Valley, and about 7:35 P. M., while the truck was going around what is known as "Cassidy Curve" at a speed of about 25 miles per hour, it collided with a passenger car proceeding in the opposite direction at a speed of about forty or forty-five miles per hour, and as the result thereof, plaintiff's intestate sustained injuries from which he died on August 3d, 1931.

Said Roland E. Mack left him surviving Jean A. Mack, his widow, and Lorraine C. Mack and Richard E. Mack, his minor children, as his only heirs;—all of whom were dependent upon him for their support.

Prior to the time of his enlistment, claimant's intestate was a union carpenter whose income prior to May 1st, 1931 was approximately $4,000.00 a year.

Jean A. Mack was appointed administratrix of the estate of said decedent by the Probate Court of Cook County, and filed her claim herein on July 13th, 1932 and seeks to recover the sum of $10,000.00 as financial help or assistance under the provisions of Paragraph eleven (11) of Article (16) of the Military and Naval Code of this State.

Such administratrix commenced a suit against Richard James Luhmann, the driver of the car which collided with the army truck, and recovered a judgment for $5,000.00, but it appears that such judgment is uncollectible.

A military board of inquiry found that the injuries sustained by Private Roland E. Mack were incurred while in line of duty and not as a result of his personal misconduct. This finding was disapproved by Charles C. Dawes, Colonel Commanding, and by C. E. Black, Adjutant General of Illinois, as to being in line of duty. The report of said Charles C. Dawes, Colonel Commanding, was to the effect that the "death was not incurred in line of duty and was due to the misconduct of Private Mack, who should not have been riding on the fender of the truck."

Claimant bases her right to recover on Section eleven (11) of Article sixteen (16) of the Military and Naval Code of this State which provides in substance that when an enlisted man shall be killed "while performing his duty," his heirs shall have a claim against the State for financial help or assistance, and the Court of Claims shall act upon and adjust the same as the merits of each case may demand.

It therefore devolves upon the claimant to prove that her intestate was killed "while performing his duty" within the meaning of those words as used in said section.

The words "while performing his duty" as used in the Military and Naval Code seem to be more restricted in their meaning than the words "in the line of duty," which latter words have often been considered in cases involving pensions to disabled soldiers.

In 1855 Caleb Cushing, Attorney General of the United States, gave to the Department of the Interior an opinion regarding the meaning of the words "in line of duty," which has been quoted with approval in many cases since that time. In such opinion the Attorney General said in conclusion, "In fine, the phrase 'line of duty' is an apt one to denote that an act of duty performed must have relation of causation, mediate or immediate, to the wound, the casualty, the injury or the disease producing disability or death."

In the case of Gillespie's application for a pension, 2 Dec. Dept. Int. Pensions 16, the claim was based upon an injury which claimant received in an altercation with a member of his company, in which the latter struck Gillespie upon the head with a board and injured his skull. The claim was disallowed on the ground that the injury was not received "in line of duty." In disposing of the case it was said, "but the fact that the claimant did not sustain a culpable relation to the cause of his disability does not by reason of the same, affect his title to pension. The question involved in the claim is not whether claimant was to blame for the conduct of his assailant, but whether the blow struck by the latter was a necessary, or even a reasonable incident of line of duty in the service."

In the case of Harding's application for a pension, 2 Dec. Dept. Int. Pen. 232, claimant sustained a partial paralysis of the brain as the result of a saber cut inflicted by a comrade while claimant was asleep in his bunk on a boat, being mistaken for another person. The claim was rejected upon the ground that the injury was not received while "in service and in the line of duty." In that case it was said: "The Department holds in this and all similar cases that the wound, injury or disease must be the natural, probable, or proximate result, either mediate or immediate, of the

soldier's military duty, and that the phrase 'line of duty' denotes that an act of duty performed in order to entitle claimant to a pension must have relation of causation, mediate or immediate, to the wounds or injury received or the disease contracted, and which produced the said disability or death. * * * The question is not whether the soldier was in line of duty at the time he received his injury, in the sense that he was not disobeying any military law, rule or regulation, or guilty of any culpable negligence, but rather, what is the quality or condition of the act which produced the injury of which complaint is made? Claimant was not wounded or disabled because he was a soldier.''

In the claim of Ammerman for pension, 1 Dec. Dept. Int. Pen. 5, the claim was rejected on the ground that the cause of the disability or death giving title to pension must in some manner pertain to, and have a natural and logical connection with, the military service and to line of duty in said service.

In the case of *Hutchins* vs. *Covert,* 30 Ind. App. 382, 78 N. E. 1061, it was held that a policeman who, while on duty, committed suicide because of insanity, did not lose his life ''while in the line of duty,'' within the meaning of that phrase as used in a statute providing for a pension for members of the family of a policeman, upon his death, ''while in the line of his duty, or from natural causes,'' where it is not shown that the insanity was the result of the performance of any duty.

In *McAuliffe* vs. *Policemen's Pension Fund* (Ky.) 115 S. W. 808, it was held that where a policeman, while at his home, and not on duty, undertook to clean his pistol, and in so doing accidentally killed himself, his widow was not entitled to a pension under a statute providing a pension for the widow or children of any officer, member, or employee of the police department who ''shall, while in the performance of his duty, be killed or die as the result of an injury received in the line of his duty.''

In *Scott* vs. *Jersey City,* 68 N. J. 629, 54 Atl. 441, it was held that the widow of a fireman killed by falling from a trolley car while on his way home to supper, under leave for that purpose, was not entitled to a pension under a statute providing for the allowance of a pension to the widow of any officer or man permanently employed in the fire department,

who should be fatally injured while in the performance of, or attempting to discharge, his duty. A preceding section of the Act provided for a like pension to a fireman "whose duty requires active service in the extinguishment of fires," and who should become incapacitated for further duty as the result of injury received or sickness contracted in the discharge, or attempt to discharge, such duty. The two sections, read in conjunction, were held clearly to show that what the Legislature intended was that the principle upon which the municipal body should dispense its bounty should be the same under both sections, and that was the recognition of the extra hazard that comes to the members of the department while discharging, or attempting to discharge the duties required in the active service of extinguishing fires.

In *Gummorson* vs. *Toronto Police Benefit Fund,* 11 Ont. L. Rep. 194, it was held that an injury sustained by a policeman while vaulting over a wooden horse in a gymnasium, this being part of a manual exercise prescribed by an inspector in the police force, was received while engaged in the execution of his duty, within the meaning of a rule of a police benefit fund, providing for pensioning policemen who receive injuries in the execution of duty.

In the case of *Meyer* vs. *Dollar SS Line,* 49 Fed. (2nd) 1002, the plaintiff, a seaman, received a leg injury in a good-natured scuffle with a fellow shipmate, and the question arose as to whether the injury occurred "in service of ship." In that case the court said that the phrase "service of ship" as applied to ordinary seamen, is closely analagous to the phrase "line of duty" as applied to soldiers and sailors in the service of the United States; that an injury suffered or a disease contracted by a sailor is considered to have been in "line of duty" unless actually caused by something for which the sailor is responsible, which intervenes between his performance of duty and the injury or disease;—and held that the injury did not occur in "service of ship."

In the case of *The People ex rel Donovan* vs. *Retirement Board,* Etc., 326 Ill. 579, plaintiff's intestate was a member of the Police Department in the City of Chicago and a member of the Department band and octette, and frequently procured music for his organization upon the order of the drill master of the Police Department. He was unable to get

certain music which he desired in Chicago, and his superior officer directed him to send to New York therefor. He dictated a letter to the stenographer, and thereafter walked across the street to deposit the same in a mail box. In crossing the street he was struck by an automobile and suffered injuries from which he died. His widow sought to recover an award of compensation annuity under the provisions of an Act which authorized the payment thereof to the widow of any policeman whose death "shall result from injury incurred in the performance of any act or acts of duty."

In that case the court said, "We are of the opinion that any injury occurring in the course of and arising out of the work of a policeman is an injury 'incurred in the performance of any act or acts of duty.' When Donovan was killed he was performing a task assigned to him by his superior officer, and that task was in connection with his duties as a member of the band and octette of the Police Department. * * * An officer assigned to this work in the Department by his superior officer is performing his duty as a member of the Department as much as when he is assigned to walking a beat or serving a writ." The right of the claimant to the compensation annuity was sustained.

Upon consideration of the cases above referred to and other authorities on the subject, we conclude that the words "while performing his duty" require that the claimant, in order to be entitled to an award in this case, show not only that her intestate was in the military service at the time of the accident, but that there was a causal relation or connection between the act of duty of such intestate and the injuries sustained by him; that the death of said soldier was the proximate result, either mediate or immediate, of the performance of his duty; that the injuries arose out of and in the course of the duties of the soldier; that the military service was the cause of the injury, and not merely coincident in time. If the soldier was guilty of any Act not connected with the service, which intervened to cause the accident in question, such accident must be held to be the result of the intervening act of the soldier and not the result of the performance of his duty.

From a consideration of all of the evidence, we find that the claimant has not established a causal relation or connec-

tion between the duty of her intestate and the accident which caused his death; that the death of claimant's intestate was not the proximate result of the performance of his duties; that the independent act of the soldier in riding in an exposed position on the fender of the truck intervened to cause the accident in question, and would have constituted contributory negligence in an action against a private employer.

We conclude, therefore, that the claimant's intestate was not "killed while performing his duty," and that claimant therefore has no claim against the State for financial assistance under the provisions of Paragraph eleven (11) of Article sixteen (16) of the Military and Naval Code.

Case dismissed.

## OPINION ON REHEARING.

*Per Curiam:*

Upon petition for rehearing claimant contends that inasmuch as she recovered a judgment in the Circuit Court of Boone County against Richard James Luhmann, driver of the automobile which collided with the truck, it cannot be said that her decedent was guilty of contributory negligence, for the reason that if he was guilty of contributory negligence, she could not have recovered in such suit.

It does not appear from the record whether the aforementioned case was contested or not, but even if it be conceded that claimant's decedent was free from contributory negligence, that fact alone will not entitle her to an award.

In order to entitle claimant to an award, she must show that the decedent was killed "while performing his duty," within the meaning of these words as used in Section 11, Article 16 of the Military and Naval Code. The proper construction of the words "while performing his duty" was fully considered at the time of the original hearing, and there is nothing in the petition for rehearing which causes us to change the views there expressed.

The petition for rehearing is therefore denied.